# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, and COALITION TO PROTECT AMERICA'S NATIONAL PARKS,<br><br>Petitioners,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency Administrator,<br><br>Respondents. | Case No. _____ |

## <u>PETITION FOR REVIEW</u>

Pursuant to Clean Air Act Section 307(b)(1), 42 U.S.C.

§ 7607(b)(1), Federal Rule of Appellate Procedure 15(a), and Ninth

Circuit Rule 15-1, National Parks Conservation Association, Natural

Resources Defense Council, Sierra Club, and Coalition to Protect

America's National Parks petition this Court for review of the final

action entitled *Partial Approval and Partial Disapproval of Air Quality*

*Implementation Plans; Hawaii; Regional Haze State Implementation*

*Plan for the Second Implementation Period* and published in the

Federal Register at 91 Fed. Reg. 31941 (May 29, 2026). A copy of the

Environmental Protection Agency's final action is attached as

Exhibit A.

Dated: July 22, 2026.

| | |
|---|---|
| <u>*/s/ Abirami Vijayan*</u> | <u>*/s/ Benjamin Chagnon*</u> |
| Abirami Vijayan | Benjamin Chagnon |
| Sarah A. Buckley | Earthjustice |
| Natural Resources Defense | 1250 I St. NW, 4th Floor |
|    Council | Washington, DC 20005 |
| 1152 15th St. NW, Suite 300 | (202) 745-5210 |
| Washington, DC 20005 | bchagnon@earthjustice.org |
| (202) 836-9866 | |
| avijayan@nrdc.org | Isaac H. Moriwake |
| sbuckley@nrdc.org | Earthjustice |
| | 850 Richards St., Suite 400 |
| *Counsel for Petitioner Natural* | Honolulu, HI 96813 |
| *Resources Defense Council* | (808) 599-2436 |
| | imoriwake@earthjustice.org |

*Counsel for Petitioners National Parks Conservation Association, Sierra Club, and Coalition to Protect America's National Parks*

## <u>LIST OF RESPONDENTS UPON WHOM THE CLERK OF THE COURT SHOULD SERVE THIS PETITION</u>

Pursuant to Federal Rule of Appellate Procedure 15(c) and Ninth Circuit Rule 15-1, Petitioners list the following respondents requiring service of the Petition for Review:

Lee Zeldin
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
WJC Building North/South Room: 1101A
Washington, D.C. 20460

Todd Blanche
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

*/s/ Benjamin Chagnon*
Benjamin Chagnon

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 22, 2026, the foregoing Petition for Review and the attached Exhibit A were electronically filed with the Clerk of Court of the U.S. Court of Appeals for the Ninth Circuit through the Appellate Case Management System (ACMS).

<u>*/s/ Benjamin Chagnon*</u>
Benjamin Chagnon

# EXHIBIT A

**Federal Register** / Vol. 91, No. 103 / Friday, May 29, 2026 / Rules and Regulations **31941**

EPA-APPROVED INDIANA SOURCE-SPECIFIC PROVISIONS

| CO date | Title | SIP rule | EPA approval | Explanation |
|---|---|---|---|---|
| * | * | * | * | * | * | * |
| 2/26/2025 .......... | Keystone Automotives Industries. | 8–3–2 | 5/29/2026, 91 FR [INSERT **FEDERAL REGISTER** PAGE WHERE THE DOCUMENT BEGINS]. | Equivalent control. |

\* \* \* \* \*

[FR Doc. 2026–10776 Filed 5–28–26; 8:45 am]
**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

**[EPA–R09–OAR–2025–0152; FRL–12584–02–R9]**

**Partial Approval and Partial Disapproval of Air Quality Implementation Plans; Hawaii; Regional Haze State Implementation Plan for the Second Implementation Period**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is partially approving and partially disapproving the regional haze state implementation plan (SIP) revision submitted by Hawaii on August 2, 2024, under the Clean Air Act (CAA) and the EPA's Regional Haze Rule (RHR) for the program's second implementation period. Hawaii's SIP submission is intended to address the requirement that states must periodically revise their long-term strategies for making reasonable progress towards the national goal of preventing any future, and remedying any existing, anthropogenic impairment of visibility, including regional haze, in mandatory Class I Federal areas. The SIP submission also addresses other applicable requirements for the second implementation period of the regional haze program. The EPA is approving the portions of Hawaii's submission relating to calculations of baseline, current, and natural visibility conditions, progress to date, the uniform rate of progress, reasonably attributable visibility impairment, progress report requirements, and monitoring strategy and other implementation plan requirements. The EPA is disapproving the long-term strategy, including the enforceable shutdown of several electric generating units at facilities on the islands of Hawaii and Maui. Additionally, we are disapproving the

portions of the submission relating to reasonable progress goals and Federal land manager (FLM) consultation requirements.

**DATES:** This rule is effective on June 29, 2026.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R09–OAR–2025–0152. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov,* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional availability information.

**FOR FURTHER INFORMATION CONTACT:** Michael Dorantes, Geographic Strategies and Modeling Section (AIR 2–2), EPA Region IX, 75 Hawthorne Street, San Francisco, CA, telephone number: (415) 972–3934, email address: *dorantes.michael@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document, "we," "us," and "our" refer to the EPA.

### Table of Contents

I. Background
II. Summary of Public Comments and Responses
III. Final Action
IV. Statutory and Executive Order Reviews

### I. Background

On August 12, 2022, the Hawaii Department of Health (HDOH) submitted a revision to its SIP, titled "Hawaii State Department of Health Regional Haze State Implementation Plan, Second Planning Period" to address regional haze for the second implementation period.[1] Then, on

August 2, 2024, HDOH withdrew its original SIP submission and simultaneously submitted a revised regional haze SIP submission, titled "Hawaii State Department of Health Regional Haze State Implementation Plan, Revision 1, Second Planning Period" (the "2024 Hawaii Regional Haze Plan" or "the Plan") for the second implementation period.[2] HDOH made this SIP submission to satisfy the requirements of the CAA's regional haze program pursuant to CAA sections 169A and 169B and 40 CFR 51.308.

On February 17, 2026, the EPA proposed to partially approve and partially disapprove the 2024 Hawaii Regional Haze Plan.[3] Specifically, we proposed to approve the elements of the 2024 Hawaii Regional Haze Plan related to requirements contained in 40 CFR 51.308(f)(1), (f)(4) through (6), and (g)(1) through (5) and to disapprove the elements of the 2024 Hawaii Regional Haze Plan related to requirements contained in 40 CFR 51.308(f)(2), (f)(3), and (i)(2) through (4). In particular, the EPA noted that Hawaii's long-term strategy included the enforceable shutdown of six boiler units at the Kanoelehua-Hill and Kahului Generating Stations, on the islands of Hawaii and Maui, respectively, and the option to shut down several diesel engine generators at the Maalaea Generating Station on the island of Maui. However, the owner of these units, Hawaiian Electric Company ("Hawaiian Electric" or the "Company"),[4] no longer consents to these shutdowns due to concerns that they would result in potential energy reserve shortfalls which would endanger grid reliability. We proposed to find that approval by the EPA of source closures that are now opposed by the sources' owner (hereinafter "forced" or "unconsented" closures) without just compensation, could violate the Takings

---

[1] Letter dated August 11, 2022, from Elizabeth Char, Director of Health, Hawaii Department of Health, to Martha Guzman, Regional Administrator, EPA Region IX (submitted electronically on August 12, 2022).

[2] Letter dated August 2, 2024, from Kenneth Fink, Director of Health, Hawaii Department of Health, to Martha Guzman, Regional Administrator, EPA Region IX (submitted electronically on August 2, 2024).

[3] 91 FR 7204 (February 17, 2026).

[4] "Hawaiian Electric" or the "Company" refers to Hawaiian Electric Company, Inc., Hawai'i Electric Light Company, Inc. and/or Maui Electric Company, Limited.

**31942** **Federal Register** / Vol. 91, No. 103 / Friday, May 29, 2026 / Rules and Regulations

Clause of the U.S. Constitution and possibly comparable provisions of State law, and that Hawaii has not provided the necessary assurances that such violations would not occur as required by CAA section 110(a)(2)(E)(i). Therefore, the EPA proposed to find that the long-term strategy did not meet the requirements of CAA 110(a)(2)(E)(i) and therefore did not meet the requirements of 40 CFR 51.308(f)(2). We also noted that, in the absence of an approved long-term strategy, we could not approve the associated reasonable progress goals (RPGs) under 40 CFR 51.308(f)(3) or the FLM consultation requirements under 40 CFR 51.308(i)(2) through (4).

## II. Summary of Public Comments and Responses

During the public comment period, the EPA received 13 unique comment submissions on the proposed rule. The full text of comments received is included in the publicly posted docket associated with this rulemaking at *https://www.regulations.gov.* Below we provide brief summaries of some of the significant comments received and our responses. Our response to comments (RTC) document, which is included in the docket for this rule, provides detailed responses to all significant comments received and is a part of the administrative record for this action.

Four commenters expressed overall support for our proposed action. One of these commenter's primary concern is that the unit retirement dates in the SIP may not allow for enough time to successfully procure and place in service replacement projects needed to maintain grid reliability and integrity. Referencing the significant challenges that have arisen for numerous projects on which Hawaiian Electric was relying to replace generation scheduled to retire, Hawaiian Electric urged the EPA to finalize the partial disapproval. Hawaiian Electric, additionally provided information regarding grid reliability and the cost of controls and stated that it "agrees with EPA's additional bases for disapproval." Another commenter expressed support for the proposed rule because it shows the need to balance State flexibility with Federal oversight, and that States should be able to create plans that fit their own situations, but there also has to be accountability. That commenter supported the EPA's decision to "disapprove the parts of the SIP about the long term strategy and extra emission controls." A different commenter supported the EPA's proposal because while shutting down electrical facilities "may produce the desired affect [sic]," overall the decision

will have backlash and we cannot get rid of one problem by creating another, especially for a State as small as Hawaii.

Other commenters opposed the EPA's proposed partial disapproval. We briefly summarize and respond to these comments below.

### A. Comments Regarding Necessary Assurances

The EPA received comments regarding the proposed finding that Hawaii failed to provide necessary assurances that unconsented enforceable source closures would not be prohibited by State or Federal law, as required by CAA section 110(a)(2)(E). The EPA proposed that the unconsented closure of operating sources, without just compensation, could violate the Takings Clause of the U.S. Constitution and possibly comparable provisions of State law, and that Hawaii has not provided necessary assurances that such violations would not occur. Some commenters opposing our proposed partial disapproval of the 2024 Hawaii Regional Haze Plan asserted that partially disapproving a SIP based on lack of necessary assurances under CAA section 110(a)(2)(E) would be unlawful, speculative, arbitrary, and capricious. Those commenters stated that a disapproval based on CAA section 110(a)(2)(E)(i) would be arbitrary and capricious because, among other reasons, Hawaii has a reliance interest in the RHR and the 2019 Guidance that commenters understood as supporting the ability of a State to include enforceable source closure deadlines as part of its long-term strategy for regional haze SIPs. Additionally, commenters emphasized that when a State includes "voluntary" requirements in a SIP, it is unreasonable for States to consider a potential violation of the Takings Clause. Those commenters represented that the necessary assurances argument mischaracterizes closure deadlines as forced or unconsented, and thus that the EPA failed to provide a legal rationale for requiring Hawaii to provide necessary assurances that a "voluntary" closure deadline would not violate the Takings Clause.

On the takings argument, specifically, some commenters argued that "voluntary" closure deadlines do not constitute takings under the Supreme Court's analysis in *Penn Central Transportation Co.* v. *New York City,* 438 U.S. 104 (1978) or *Lucas* v. *South Carolina Coastal Council,* 505 U.S. 1003 (1992). The commenters asserted that our reliance at proposal on *per se* takings case law is misplaced because the closures are not permanent physical intrusions and do not deprive owners of

their properties' complete economic value. As for regulatory takings, commenters stated that we failed in the proposed rulemaking to consider the *Penn Central* factors.[5]

Some commenters also challenged the EPA's authority to decide constitutional questions.

We disagree with the comments questioning the EPA's authority to consider issues involving the Takings Clause under CAA section 110(a)(2)(E)(i). CAA section 110(a)(2)(E)(i) provides that State plans must provide "necessary assurances" that the State "is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof." The best reading of this provision is that the EPA may not approve a SIP revision that risks violating Federal or State law in the course of implementation and for which the State has not provided necessary assurances that there will be no such violation. The Takings Clause of the Fifth Amendment, applicable to the States via the Fourteenth Amendment, provides that the government shall not take private property for public use without just compensation. Under the CAA's cooperative-federalism framework, States can determine what emission limits and other measures to include in their SIPs as long as they meet the requirements of the Act.[6] However, those state-selected measures must observe statutory and constitutional limits, as contemplated by the text of CAA section 110(a)(2)(E). Thus, in this case, while a constitutional issue is implicated, the fundamental issue is that the SIP lacks necessary assurances under CAA section 110(a)(2)(E)(i). In this context, the EPA disagrees with comments stating that ensuring the requirements of the CAA are satisfied, including the requirement that State plans are supported by necessary assurances regarding compliance with the law, is not within or relevant to the EPA's authority. We are not adjudicating constitutional claims in this final rule. Rather, we are ensuring that our exercise of authority to approve or disapprove the SIP revision before us, thereby making it enforceable as a matter of Federal law,

---

[5] *See Penn Cent.,* 438 U.S. at 124–25. The Court enumerated three factors to consider based on the specific facts of the case in determining if a government regulation goes too far and amounts to an unconstitutional "taking" of private property, requiring compensation under the Fifth Amendment. These factors are (1) economic impact on the owner; (2) owner's investment-backed expectation; and (3) character of the government action.

[6] *Train* v. *Natural Res. Def. Council,* 421 U.S. 60, 79 (1975).

**Federal Register** / Vol. 91, No. 103 / Friday, May 29, 2026 / Rules and Regulations **31943**

is consistent with applicable requirements and limitations on the EPA's authority.

The EPA disagrees with comments alleging that we improperly characterized the enforceable closure of six boiler units at the Kanoelehua-Hill and Kahului Generating Stations as unconsented closures and thus that we failed to provide a proper legal rationale requiring Hawaii to provide necessary assurances that such "voluntary" closure deadlines would not violate the Takings Clause.[7] According to these commenters, Hawaiian Electric voluntarily decided to close specific units and Hawaii relied on the utilities' decisions when it incorporated enforceable closure provisions into State permits. Therefore, commenters opine that, at the time, Hawaii would not have known to provide necessary assurances that an unconsented source closure would not amount to a taking without just compensation. However, after Hawaii submitted the Plan to the EPA and prior to us acting on it, Hawaiian Electric retracted its decision to voluntarily close the affected units. Specifically, in a letter to the EPA dated August 29, 2025, Hawaiian Electric stated that:

. . . the Company was forced under the SIP to accept enforceable retirement deadlines for units the Company plans to retire, due [sic] the high costs of controls and fuels switches. However, these retirement deadlines are no longer acceptable because of potential negative impacts to generation reliability due to actual or potential cancellations and delays in replacement generation projects that were planned by independent power producers.[8]

The Company then explained that 115 MW of planned generation had been cancelled on the island of Hawaii, meaning that "grid reliability will be at risk in 2029 following the retirement of the Kanoelehua-Hill boilers."[9] The Company similarly noted that 20 MW of planned generation had been cancelled for Maui, and thus "a delay to the shutdown of the Kahului boilers and Maalaea generating units would reduce reliability risks," if there were delays with additional replacement generation projects on Maui.[10] Citing Adequacy of Supply Reports dated January 30, 2025, for Hawaiian Electric Light Company and Maui Electric Company, the

Company stated that "retirement of the generating units as required by the SIP deadlines will create higher probability of energy reserve margin shortfalls that increase risk to reliability on both islands."[11] The Company also emphasized that "each island must be entirely self-sufficient and cannot rely on power by wire transmission from other jurisdictions as is common in the continental United States to address reliability emergencies."[12]

Once the EPA and Hawaii received notification that Hawaiian Electric withdrew its consent for the enforceable closure provisions contained in the long-term strategy, the EPA and Hawaii were on notice that approving the long-term strategy with the inclusion of unconsented closure deadlines for the Kanoelehua-Hill and Kahului Generating Stations into the SIP could result in violation of a Federal requirement and it became incumbent upon Hawaii to provide the necessary assurances that EPA approval of these unconsented source closure would not amount to a taking without just compensation.[13] Without any representations from Hawaii to the contrary in the Plan, it is not possible for the EPA to approve the long-term strategy as meeting all applicable requirements of the Act because the submission does not contain necessary assurances that Hawaii "is not prohibited by any provision of Federal . . . law" from executing the unconsented source closures at the Kanoelehua-Hill and Kahului Generating Stations with the imprimatur of Federal approval. The long-term strategy in the 2024 Hawaii Regional Haze Plan is not compliant with all applicable requirements of the CAA and, because of that defect, also does not meet the requirements of 40 CFR 51.308(f)(2). As a result, the EPA is disapproving the long-term strategy and associated elements of the Plan.

Moreover, the EPA disagrees with commenters' representations that the lack of the necessary assurances required by the CAA is not a lawful basis to disapprove the unconsented source closures at the Kanoelehua-Hill and Kahului Generating Stations on the ground that the disapproval would conflict with the RHR and 2019 Guidance document.[14] Specifically,

commenters state that the RHR provides for the consideration of additional factors, including source retirement and replacement schedules.[15] Similarly, the comments note that the 2019 Guidance indicates that a State can shorten the remaining useful life of a source for purposes of a control analysis to account for an announced retirement but only if the State makes the retirement federally enforceable. However, neither the RHR nor the CAA's regional haze provisions reference or contemplate *forced* closures. Moreover, the 2019 Guidance document referenced by commenters does not address the situation here. Rather, the 2019 Guidance states that "*[i]f* a source is expected to close by December 31, 2028, under an enforceable requirement, a State may consider that to be sufficient reason" not to select the source for a four-factor analysis.[16] The 2019 Guidance also states that, "[i]n the situation of an enforceable requirement for the source to cease operation before the end of the useful life of the controls under consideration, a State may use the enforceable shutdown date as the end of the remaining useful life."[17] Nothing in the 2019 Guidance suggests that States may force unconsented closures as part of a regional haze plan. We therefore do not agree with comments suggesting that disapproval of the unconsented closures at the Kanoelehua-Hill and Kahului Generating Stations reflects a change in the EPA's position with respect to such closures. Circumstances change, and insisting on the unconsented plant closures at the Kanoelehua-Hill and Kahului Generating Stations under these circumstances threatens violations of Federal law, including additional CAA provisions instructing states and the EPA to account for the consequences of requirements adopted to promote regional haze goals.

Even if Hawaii had a legitimate reliance interest in the RHR and the 2019 Guidance document and shortened the remaining useful life of a source in its control analysis accordingly, the commenters fail to address that a SIP containing a *forced* shortened remaining useful life for a source does not meet all the requirements of the CAA, including

---

[7] As discussed further in the RTC document, the closure of additional units at Maalaea Power Plant is optional and therefore does not pose a risk of a taking.

[8] Letter dated August 29, 2025, from Karin Kimura, Director, Environmental Division, Hawaiian Electric, to Josh F.W. Cook, Regional Administrator, EPA Region 9, pp. 1–2.

[9] *Id.* at 3.

[10] *Id.* at 3.

[11] *Id.*

[12] *Id.*

[13] *See* 42 U.S.C. 7410(a)(2)(E)(i).

[14] Guidance on Regional Haze State Implementation Plans for the Second Implementation Period. *https://www.epa.gov/visibility/guidance-regional-haze-state-implementation-plans-second-implementation-period.* The EPA Office of Air Quality Planning and

Standards, Research Triangle Park (August 20, 2019) ("2019 Guidance").

[15] 40 CFR 51.308(f)(2)(iv)(C).

[16] 2019 Guidance at 20 (emphasis added); *see also id.* at 42 n.74 (providing further that this discussion applies "if a source is *certain* to close . . . under an enforceable requirement, a State can reasonably consider that to be sufficient reason to remove the source from further analysis and reasonable progress consideration") (emphasis added).

[17] *Id.* at 34.

**31944** **Federal Register** / Vol. 91, No. 103 / Friday, May 29, 2026 / Rules and Regulations

ensuring that a SIP or SIP revision includes necessary assurances consistent with CAA section 110(a)(2)(E)(i). The EPA can only approve a SIP revision if it meets all the requirements of the CAA.[18] This includes ensuring that the SIP contains the necessary assurances under CAA section 110(a)(2)(E)(i) that the implementation of the SIP is not prohibited by Federal or State law, including here, prohibitions on uncompensated takings of property interests without consent. Without these assurances, the EPA lacks authority to approve the long-term strategy containing unconsented closure provisions for the Kanoelehua-Hill and Kahului Generating Stations.

Finally, some commenters assert that the EPA inappropriately relied on *Cedar Point Nursery* v. *Hassid,* 594 U.S. 139 (2021) and *Horne* v. *Department of Agriculture,* 576 U.S. 351 (2015), which involved physical *per se* takings, to argue that a taking cannot occur when a source voluntarily agrees to a closure and that the cases are inapplicable to the circumstances in Hawaii, positing that there is not a physical or *per se* taking. For the reasons described elsewhere in this document and the RTC, we do not agree that the closures in the Plan are voluntary. Moreover, commenters misunderstand these cases. *Cedar Point Nursery,* for example, established that a *per se* taking may occur when the government deprives property owners of exclusive rights to even a portion of their property, in that case, by forcing owners to allow union organizers onto the property for relatively brief periods. Commenters do not explain or point to necessary assurances provided by Hawaii in the Plan that approving unconsented closure of units at the Kanoelehua-Hill and Kahului Generating Stations would not similarly involve or amount to any form of *per se* taking.

Some commenters cited to *Lucas* v. *South Carolina Coastal Council* in support of their assessment that because approval of the closure deadline into Federal law would not deprive the utility of "all economically beneficial or productive use of land," compensation would not be required under the Federal Takings Clause.[19] But *Lucas* applies only to instances of total deprivation of use, and it relied on "background principles of State's law of property and nuisance," which are not the issues in this action.[20] An unconsented deadline to close electric generating units

reasonably appears to be the equivalent to a *per se* taking, permanently restricting Hawaiian Electric's right over its property. Critically, the EPA is not adjudicating constitutional claims in this final rule. Rather, we are finding that Hawaii failed to provide necessary assurances that the unconsented closure permit provisions for the Kanoelehua-Hill and Kahului Generating Stations are not unlawful.

We recognize the U.S. Supreme Court has explained in several cases that there are two categories of action that can result in a *per se* taking: (1) where the government requires an owner to suffer a permanent physical invasion of property; and (2) when regulations completely deprive an owner of "all economically beneficial us[e]" of property.[21] In this case, we disagree with commenters that because *Horne* and *Cedar Point* involve physical takings, they are inapplicable. Under the Court's jurisprudence, a physical taking occurs when the government physically appropriates or occupies private property for public use. As explained below, the Court in *Horne* and *Cedar Point* addressed questions that are pertinent to the facts at issue in the Hawaii action.

According to commenters, closure deadlines are not a physical appropriation of property for various reasons. In *Cedar Point,* a government regulation restricted an owner's "right to exclude" from the owner's property.[22] The Court emphasized the importance of this right, and how the appropriation of the right to physically invade private property requires compensation.[23] Because incorporating the unconsented closures at the Kanoelehua-Hill and Kahului Generating Stations into the SIP would make the unconsented closures federally enforceable, this could cause the permit provisions to appropriate the Company's right to control the operation of its facilities. The CAA and RHR do not require sources to close to meet reasonable progress. Hawaii did not provide necessary assurances in the Plan that the enforceable closures at the Kanoelehua-Hill and Kahului Generating Stations would not involve the type of property right deprivation at issue in *Cedar Point.*

In *Horne,* the Court determined that whenever there is a physical appropriation, it is not right to question whether the appropriation deprives the

owner of all economically valuable use of the item taken.[24] This question was also addressed in *Tahoe,* where the Court determined that if the government takes possession of an interest in property for public purpose, "it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."[25] Similarly, the unconsented closure of Hawaiian Electric's units would force the utility to change the use of its property—which would be comparable to the government deciding how to dispose of the goods set aside in *Horne*—even though a source closure is not a statutory or regulatory requirement under CAA section 169A and 40 CFR 51.308(f). Thus, the EPA disagrees with commenters' proposition that *Cedar Point* and *Horne* are inapplicable to the unconsented closures at the Kanoelehua-Hill and Kahului Generating Stations in the 2024 Hawaii Regional Haze Plan.

As already discussed, it is reasonable to conclude that the facts at issue involve a *per se* taking. Therefore, the framework of *Penn Central,*[26] which governs regulatory takings, is likely not directly relevant to this final action, as "[i]t is 'inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a "regulatory taking," and vice versa.'"[27] Nonetheless, for completeness, we also consider whether the unconsented closure of the Kanoelehua-Hill and Kahului units, absent necessary assurances under CAA section 110(a)(2)(E)(i), could constitute a regulatory taking.

Without necessary assurances under CAA section 110(a)(2)(E)(i), there is no demonstration that neither a total nor partial regulatory taking will occur from implementation of the unconsented closure provisions for Kanoelehua-Hill and Kahului Generating Stations contained in the 2024 Hawaii Regional Haze Plan. A total regulatory taking would occur if the closure would fully deprive the source owner of all economic use of the land under the standard described in *Lucas.*[28] "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."[29] The U.S.

---

[18] 42 U.S.C. 7410(k)(3).
[19] 505 U.S. 1003 (1992).
[20] *Id.* at 1029.

[21] *See Horne,* 576 U.S. at 351; *Tahoe-Sierra Pres. Council, Inc.* v. *Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330 (2002) (citing *Lucas,* 505 U.S. at 1019–20).
[22] *Cedar Point Nursery,* 594 U.S. at 139.
[23] *Id.* at 158.

[24] *Horne,* 576 U.S. at 363.
[25] *Tahoe-Sierra Pres. Council,* 535 U.S. at 323.
[26] *Penn Central,* 438 U.S. 104 (1978).
[27] *Tahoe-Sierra Pres. Council,* 535 U.S. at 323.
[28] *Lucas,* 505 U.S. at 1003.
[29] *Pa. Coal Co.* v. *Mahon,* 260 U.S. 393, 415 (1922).

Supreme Court has defined "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause" and is a "regulation that goes too far."[30] Without necessary assurances under CAA section 110(a)(2)(E)(i), it is not possible for the EPA to ensure that approval of the unconsented closures at the Kanoelehua-Hill and Kahului Generating Stations will not constitute a regulatory taking under the U.S. Constitution, given the administrative record. For this reason, the EPA is authorized under the CAA to disapprove Hawaii's long-term strategy to avoid a takings situation. The effect of such a taking could result in permanent deprivation of property and would be a textbook example of a "regulation going too far."[31]

A partial regulatory taking results when a regulation hinders the use of property but does not deprive the owner of all economically beneficial use. Here, the analysis involves considering whether approving the closures in the long-term strategy into the SIP results in (1) a significant economic impact on the claimants; (2) interference with distinct investment-backed expectations; and (3) shares characteristics with similar governmental actions considered takings.[32] Without necessary assurances to the contrary in the Plan, it is not possible for the EPA to ensure that approval of the long-term strategy containing unconsented closure provisions will not constitute a partial regulatory taking under the U.S. Constitution, given the administrative record.

Additionally, building on the analysis earlier in this section, the EPA disagrees with commenters' conclusion that the *Penn Central* test does not support a determination that a partial regulatory taking would result if the EPA codified Hawaii's unconsented closure provisions for the Kanoelehua-Hill and Kahului Generating Stations. A use restriction may constitute a taking if not reasonably necessary to the effectuation of a substantial public purpose or if it has an unduly harsh impact upon the owner's use of the property.[33] First, contrary to commenters' statements, the purpose of the CAA's regional haze provisions is to address visibility impairment in Class I areas, not to address public health. Moreover, the unconsented closure of units at the Kanoelehua-Hill and Kahului Generating Stations could threaten grid reliability on the islands of Hawaii and Maui.[34]

Second, the economic impact of the government regulation "is determined by comparing the total value of the affected property before and after the government action."[35] Here, if the EPA approves unconsented closure requirements for the Kanoelehua-Hill and Kahului units into the SIP, they would be federally enforceable, and would diminish the units' economically beneficial use and value. Thus, after considering the *Penn Central* factors in relation to the unconsented closures of the Kanoelehua-Hill and Kahului Generating units, it is not possible for the EPA to ensure that approval of these unconsented closures will not constitute a partial regulatory taking under the U.S. Constitution. An uncompensated partial regulatory taking violates Federal law and without the CAA section 110(a)(2)(E)(i) necessary assurances to the contrary, the EPA does not have the authority to approve these uncompensated unconsented closures into the SIP.

The EPA shall approve a SIP revision as a whole only if it meets all applicable CAA requirements.[36] Given the necessary assurances requirement in CAA section 110(a)(2)(E)(i) and the withdrawal of consent from Hawaiian Electric for closure of its units, Hawaii is required to provide necessary assurances to the EPA to ensure that approval of the unconsented closure provisions at the Kanoelehua-Hill and Kahului units is not prohibited by Federal law including the Takings Clause of the U.S. Constitution. However, Hawaii did not provide as part of the Plan the necessary assurances required by CAA section 110(a)(2)(E)(i) that approval of the long-term strategy containing these unconsented closure provisions will not violate Federal law by effecting uncompensated takings *per se* or a partial or full regulatory takings. Because the unconsented closures at the Kanoelehua-Hill and Kahului Generating Stations are not approvable under CAA section 110(a)(2)(E)(i), we are disapproving Hawaii's long-term strategy and related elements of the Plan.

*B. Comments Regarding Grid Reliability*

Commenters asserted that grid reliability is not a relevant consideration for regional haze plans and that Hawaiian Electric had not adequately substantiated its concerns regarding grid reliability. As noted in the proposal, the EPA's partial disapproval of the 2024 Hawaii Regional Haze Plan is not based on Hawaii's consideration of the energy impacts associated with the source closures.[37] Nonetheless, we maintain that Hawaii did not independently assess the source closures under the "energy and non-air quality environmental impacts of compliance" statutory factor, including impacts on maintaining grid reliability and Hawaiian Electric's ability to meet energy demand.

Despite the shortcomings in Hawaii's analysis of grid reliability concerns, and the significant concerns related to grid reliability if the contested closure is enacted, the EPA recognizes that our prior statements may have generated a reliance interest that led to how Hawaii developed the Plan.[38] For example, the EPA's 2019 Guidance provided a limited scope of considerations generally involved under the "energy and non-air quality factor" and it was reasonable for Hawaii to rely on the interpretation provided in that guidance–although the 2019 Guidance did not prohibit the consideration of grid reliability.

*C. Comments Regarding "Control Measures" under CAA section 110 and 169A*

One commenter opposed our proposed finding that the best reading of the phrase "control measures" in CAA section 110(a)(2)(A) and 169A(b)(2) does not encompass the authority to force a source to close, or to close on timeframe not agreed to by the owner/operator. Following our careful consideration of these comments, the EPA is no longer relying on the rationale that forced source closures contained in the 2024 Hawaii Regional Haze Plan are inconsistent with "control measures" in CAA sections 110 and 169A and that rationale is not an independent basis for our final disapproval of the 2024 Hawaii Regional Haze Plan. However, the EPA is not taking the position in this rule that forced source closures are allowed under the CAA. We note that the use of unconsented closure deadlines is different in kind from the practice of recognizing consensual, certain closures in the near future as a basis for limiting

---

[30] *Palazzolo* v. *Rhode Island,* 533 U.S. 606, 617 (2001) (quoting *Lucas,* 505 U.S. at 1015).

[31] *Mahon,* 260 U.S. at 415.

[32] *Penn Central,* 438 U.S. at 124.

[33] *Id.* at 127 (internal citation omitted).

[34] Letter dated August 29, 2025, from Karin Kimura, Director, Environmental Division, Hawaiian Electric, to Josh F.W. Cook, Regional Administrator, EPA Region 9, pp. 1–2.

[35] *Colony Cove Props., LLC* v. *City of Carson,* 888 F.3d 445, 451 (9th Cir. 2018).

[36] 42 U.S.C. 7410(k)(3).

[37] 91 FR 7204, 7218 (February 17, 2026).

[38] See, *e.g., Kentucky* v. *EPA,* 123 F.4th 447, 467–471 (4th Cir. 2025).

**31946** **Federal Register** / Vol. 91, No. 103 / Friday, May 29, 2026 / Rules and Regulations

the analysis of a source to a shorter period of remaining useful life. Instead, as explained in this document and the RTC, the use of forced closures to satisfy regional haze requirements is, at minimum, legally suspect under the CAA and other applicable sources of Federal law.

### III. Final Action

For the reasons stated in the proposal, the RTC document and in this document, we are partially approving and partially disapproving the 2024 Hawaii Regional Haze Plan. Specifically, we are approving the elements of the 2024 Hawaii Regional Haze Plan related to requirements contained in 40 CFR 51.308(f)(1), (f)(4) through (6), and (g)(1) through (5) and disapproving the elements of the 2024 Hawaii Regional Haze Plan related to requirements contained in 40 CFR 51.308(f)(2), (3), and (i)(2) through (4). A FIP or an approved SIP revision will be required to satisfy these outstanding regional haze rule requirements.[39]

### IV. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget (OMB) for review.

*B. Executive Order 14192: Unleashing Prosperity Through Deregulation*

This action is not an Executive Order 14192 regulatory action because this action is not significant under Executive Order 12866.

*C. Paperwork Reduction Act (PRA)*

This action does not impose an information collection burden under the PRA because this action does not impose additional requirements beyond those imposed by State law.

*D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities beyond those imposed by State law.

---

[39] 42 U.S.C. 7410(c).

*E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action does not impose additional requirements beyond those imposed by State law. Accordingly, no additional costs to State, local, or Tribal governments, or to the private sector, will result from this action.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*G. Executive Order 13175: Coordination With Indian Tribal Governments*

This action does not have Tribal implications, as specified in Executive Order 13175, because the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian Tribe has demonstrated that a Tribe has jurisdiction, and will not impose substantial direct costs on Tribal governments or preempt Tribal law. Thus, Executive Order 13175 does not apply to this action.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. Therefore, this action is not subject to Executive Order 13045 because it merely partially approves and partially disapproves State law as meeting Federal requirements. Furthermore, the EPA's Policy on Children's Health does not apply to this action.

*I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*J. National Technology Transfer and Advancement Act (NTTAA)*

Section 12(d) of the NTTAA directs the EPA to use voluntary consensus standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. The EPA believes that this action is not subject to the requirements of section 12(d) of the NTTAA because application of those requirements would be inconsistent with the CAA.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

*L. Judicial Review*

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by July 28, 2026 Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. See CAA section 307(b)(2).

### List of Subjects in 40 CFR part 52

Environmental protection, Air pollution control, Incorporation by reference, Nitrogen dioxide, Particulate matter, Recordkeeping and reporting, Sulfur oxides.

Dated: May 15, 2026.

**Michael Martucci,**

*Acting Regional Administrator, Region IX.*

For the reasons stated in the preamble, the EPA amends chapter I, title 40 of the Code of Federal Regulations as follows:

### PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart M—Hawaii

■ 2. In § 52.620, amend the table in paragraph (e), by adding an entry for ''Hawaii State Department of Health Regional Haze State Implementation Plan, Revision 1, Second Planning

Period excluding the Executive Summary, Chapters 2.2, 5, 6, 7, 8, and 9.5, and 10 and the Appendices'' immediately after the entry for ''Hawaii State Department of Health 5-Year Regional Haze Progress Report for Federal Implementation Plan, excluding Appendix H, I and J'' to read as follows:

## § 52.620  Identification of plan.

*    *    *    *    *

(e) * * *

### EPA APPROVED HAWAII NONREGULATORY PROVISIONS AND QUASI-REGULATORY MEASURES

| Name of SIP provision | Applicable geographic or nonattainment area | State submittal date | EPA approval date | | Explanation |
|---|---|---|---|---|---|
| * | * | * | * | * | * |
| **State of Hawaii Air Pollution Control Implementation Plans for Regional Haze** | | | | | |
| * | * | * | * | * | * |
| Hawaii State Department of Health Regional Haze State Implementation Plan, Revision 1, Second Planning Period excluding the Executive Summary, Chapters 2.2, 5, 6, 7, 8, and 9.5, and 10 and the Appendices. | State-wide ............................. | 08/02/2024 | 05/29/2026, 91 FR [INSERT **FEDERAL REGISTER** PAGE WHERE THE DOCUMENT BEGINS]. | | |
| * | * | * | * | * | * |

■ 3. Amend § 52.633 by adding paragraph (f) to read as follows:

## § 52.633  Visibility protection.

*    *    *    *    *

(f) *Disapproval.* On August 2, 2024, the Hawaii State Department of Health submitted the ''Hawaii State Department of Health Regional Haze State Implementation Plan, Revision 1, Second Planning Period.''

(1) The following portions of the ''Hawaii State Department of Health Regional Haze State Implementation Plan, Revision 1, Second Planning Period'' are disapproved because they do not meet the applicable requirements of Clean Air Act sections 169A and 169B and the Regional Haze Rule in 40 CFR 51.301 through 51.308.

(i) Executive Summary;

(ii) Chapters 5, 6, 7, 8, and 9.5; and

(iii) Appendices K, P, V, and X.

(2) [Reserved]

[FR Doc. 2026–10754 Filed 5–28–26; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 62

[EPA–R03–OAR–2025–1746; FRL–13006–02–R3]

### Approval and Promulgation of State Air Quality Plans (Negative Declarations) for Designated Facilities and Pollutants; District of Columbia

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is providing notice of and is codifying approval of negative declarations submitted by the District of Columbia Department of Energy and Environment (DCDOEE) on July 19, 2024 and August 28, 2024. The negative declarations submitted by the DCDOEE certify that there are no existing large municipal waste combustors (LMWC), crude oil and natural gas facilities (ONG), or electric utility generating units (EGU) subject to sections 111(d) and 129 of the Clean Air Act (CAA) within the jurisdiction of the District of Columbia.

**DATES:** This final rule is effective on June 29, 2026.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID Number EPA–R03–OAR–2025–1746. All documents in the docket are listed on the *Regulations.gov* website. Some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *Regulations.gov,* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additionally available information.

**FOR FURTHER INFORMATION CONTACT:** Krystal Stankunas, Permits Branch (3AP10), Air & Radiation Division, U.S. Environmental Protection Agency, Region III, 1600 John F Kennedy Boulevard, Philadelphia, Pennsylvania 19103. The telephone number is (215) 814–5271. Ms. Stankunas can also be reached via electronic mail at *Stankunas.krystal@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

On November 20, 2025, 90 FR 52313, the EPA published a notice of proposed rulemaking (NPRM). In the NPRM, EPA proposed approval of the negative declarations submitted by District of Columbia Department of Energy and Environment (DCDOEE). The negative declarations certify that there are no existing large municipal waste combustors (LMWC), crude oil and natural gas facilities (ONG), or electric utility generating units (EGU) subject to sections 111(d) and 129 of the CAA within the jurisdiction of the District of Columbia.

The CAA requires State regulatory agencies to implement emission guidelines and associated compliance times using a State plan developed under sections 111(d) and 129 of the CAA. Section 111(d) of the CAA establishes standards of performance for certain existing sources. Air pollutants included under this section are those which have not already been established as air quality criteria pollutants via 42 U.S.C. 7408(a) or hazardous air pollutants via 42 U.S.C. 7412. Section 111(d)(1) of the CAA requires States to submit to the EPA for approval a plan that establishes standards of performance. The plan must provide that the State will implement and enforce the standards of performance.